## LANGDON v. TAYLOR.

(Circuit Court of Appeals, Second Circuit.   July 1, 1910.)

No. 236.

1. TRIAL (§§ 71, 390*)—DIRECTION OF VERDICT—SUBSEQUENT JURISDICTION.

After a verdict is directed and the jury discharged, the trial judge may set the verdict aside and grant a new trial; but he has no jurisdiction to admit new evidence, make new findings on the evidence already given, or add to or subtract from the record.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 167; Dec. Dig. §§ 71, 390.*]

2. BROKERS (§ 7*)—CONTRACT—PROVISIONS.

Where a contract employing a broker to sell coal lands provided for the payment of a commission on the broker effecting a sale within six months from August 19, 1904, and further provided that, if during the six months the broker named to the owner a probable purchaser and the property came under the control of the person so named, the broker should be entitled to the commission if the sale or lease was made within a year from February 19, 1905, the agreement was neither unilateral nor abnormal.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 5–8; Dec. Dig. § 7.*]

3. BROKERS (§ 56*)—SALE OF COAL PROPERTY—RIGHT TO COMMISSIONS.

Defendant employed plaintiff to sell certain coal land for $250,000, agreeing to pay $10,000 commissions in case a sale was effected within six months from August 19, 1904, and that if during such time the broker named to defendant a probable purchaser, and the property came under such purchaser's control within a year from February 19, 1905, the broker should be entitled to commissions. Plaintiff, on the day the agreement was made, named the Ontario & Western Railway as a probable purchaser, and within the time specified the land was sold to R., who was secretary and treasurer of the railroad company, and also of the S. Coal Company; the sale having been made through B., who was attorney for both companies. R. thereafter transferred the property to the S. Coal Company, all of the stock of which, except a few qualifying shares, was owned by the railroad company, and it was also shown that a majority of the coal company's directors were directors of the railway company. *Held*, that the property was sold to the railway company within the terms of the contract, entitling plaintiff to commissions.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 56.*]

In Error to the Circuit Court of the United States for the Western District of New York.

Action by William H. Taylor against Andrew Langdon. Judgment for plaintiff for $12,209.34, and defendant brings error. Affirmed.

Kenefick, Cooke & Mitchell (James McCormick Mitchell, of counsel), for plaintiff in error.

George B. Curtiss and Albert L. Watson, for defendant in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge.   The record presents no question of fact. At the close of the testimony both parties moved for the direction of a verdict.   The question at issue is one of law and depends upon the construction of a written instrument.   The facts are as follows:

Andrew Langdon, the defendant, was the owner of a tract of coal

land at Carbondale, Pa. William H. Taylor, the plaintiff, residing at Scranton, Pa., was a man of experience in buying, selling, and leasing coal property. Langdon desiring to sell his coal land employed Taylor as his agent to effectuate the sale, the parties entering into a written agreement August 19, 1904. The paragraphs of this contract which it is necessary to consider are as follows:

"Second.—When sale has been made, the party of the first part agrees to accept in full payment for the above property the sum of two hundred and fifty thousand dollars ($250,000.00) less the sum of ten thousand dollars ($10,000.00) to be paid by the party of the first part to the party of the second part as his commission, it being agreed that the party of the second part has the privilege of obtaining, and shall be paid as a further profit to himself, whatever amount may be secured for the property over and above the price of two hundred and fifty thousand dollars ($250,000.00) and further agrees to promptly deliver the said property with free and unencumbered title to the purchaser thereof.

"Third.—It is distinctly understood and agreed that the period given to the party of the second part in which to dispose of this property is six (6) months from the date hereof, and it is further understood and agreed, that if the property should be sold or leased, or come under the control of, in any manner, any of the parties who may be named during the said six (6) months to the party of the first part, or any of his agents or representatives, by the party of the second part as probable purchasers or lessees, then in that event the commission herein ($10,000.00) is to be paid the party of the second part by the party of the first part upon the consummation of sale or lease to such parties whenever the same might occur.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Sixth.—If at the end of six (6) months from the date hereof, no sale or lease has been effected. then this agreement shall be null and void, except as to the provision in Section 'Three' which will remain in full force and effect for one (1) year thereafter."

The plaintiff testified that on the day the agreement was made he named the Ontario & Western Railway, the Scranton Coal Company, and some others, as probable purchasers. In this he is corroborated by Morgan Davis, Jr., but the defendant denies that the Scranton Coal Company was so mentioned. It is suggested by counsel for defendant that the Scranton Coal Company, which became the ultimate purchaser, cannot be considered by the court for the reason that the assertion that it was named by the plaintiff is disputed by the defendant. We incline to the opinion that by moving for the direction of a verdict the defendant conceded all the facts as sworn to by the plaintiff, contending that, even in their most favorable aspect, they presented no ground for recovery. At the close of the evidence both sides moved for a direction and the defendant made no request that the question—whether or not the coal company was named—should be submitted to the jury.

After the direction of the verdict the jury were discharged and the court adjourned for two months with permission to present the question again upon a motion for a new trial. On the adjourned day counsel for the defendant presented 44 special findings of fact which he requested the court to find and asked to be heard upon the question of fact "as to whether the Scranton Coal Company was named by the plaintiff as a probable purchaser." The court very properly declined to make any special findings and the defendant reserved an exception.

He also filed 12 exceptions to the "remarks of the court" in deciding the motions for the direction of a verdict. In making these requests and noting these exceptions counsel for the defendant has, we think, been misled into thinking that because the jury was instructed as to its verdict, the trial is to be considered as if it were a trial by the court, a jury having been waived.

Of course, after the verdict was directed and the jury discharged the record in the Circuit Court was made up. The trial judge could set the verdict aside and grant a new trial, but he could not admit new evidence or make new findings upon the evidence already in, or add to or subtract from the record in any way—the trial was ended.

It seems probable that defendant's counsel are now in accord with these suggestions for they say in their brief, regarding their exceptions to the remarks of the court in directing the verdict:

"We have come to the conclusion that it was wholly unnecessary to file any such exceptions. The exception taken to the verdict directed was clearly sufficient to raise every question of law presented by the undisputed evidence."

Whether or not counsel dispute the proposition that the Scranton Coal Company is to be considered as one of the probable purchasers named by the plaintiff, is not entirely clear. We think we are justified in assuming that they do not, in view of the fact that, in response to an inquiry by the court, counsel expressly stated that they did not wish to go to the jury upon this question, and also in view of the following quotation from the defendant's brief:

"We do not, however, propose to discuss the evidence on this issue, because we must assume that the question was resolved against us by the direction of a verdict in the plaintiff's favor in the court below. We cannot argue the question of fact here. The only question presented in this regard is whether the Circuit Court should not have submitted this one issue of fact to the jury, or made a special finding thereon in accordance with our request."

However this may be, we do not deem it of vital importance because it is conceded on all hands that the Scranton Coal Company is a creature of the Ontario & Western Railway Company and that the latter company was named by the plaintiff. All of the capital stock of the coal company was owned by the railway company except the few shares necessary to qualify the directors. Counsel for defendant say in their brief:

"We do not deny that the Scranton Coal Company was, in a certain sense, controlled by the New York, Ontario & Western Railway Company by virtue of its stock ownership; nor do we deny that Rickard was, in a certain sense, controlled by the Scranton Coal Company in regard to the purchase in question, because it furnished him the money with which to effect such purchase."

If, then, it appears that the defendant's coal land was sold or leased to the Scranton Coal Company during the period stipulated in the contract, it follows that it came under the control of a purchaser named by the plaintiff; to wit, the Ontario & Western Company.

Turning now to the contract we find nothing ambiguous in its provisions. Langdon employed Taylor to sell his Pennsylvania coal land for $250,000 and agreed to pay Taylor $10,000, as his commission, in making the sale if made within six months from August 19,

1904. The agreement further provides that if during the said six months Taylor names to Langdon a probable purchaser and the property comes under the control of the person so named Taylor shall be entitled to the said sum of $10,000 if the sale or lease is made within one year from February 19, 1905. We see nothing abnormal or unilateral in this agreement. The provision preventing a surreptitious sale to the broker's customer is not unusual and, in view of subsequent events, seems to have been wise and necessary. It was simply a stipulation on Langdon's part that if Taylor disclosed to him the name of the party to whom he proposed to sell the property and that party came into full control prior to February 19, 1906, he (Taylor) should not lose his commission. In legal effect it was as if Langdon had said to Taylor:

"If you sell my coal property or give me the name of a customer who buys, leases or gets full control of said property within eighteen months, so that I receive $250,000, I will pay you $10,000."

In the learned brief of the counsel for defendant, considerable space is devoted to the legal and technical meaning of the word "commission." We deem it unnecessary to follow this discussion for the reason that there can be no doubt as to the meaning of the parties in the agreement in question. The $10,000 which Langdon agreed to pay is described as a "commission." It might as well have been called "fee" or "compensation," or it might have been left undesignated. Strike out the words "as his commission" and the meaning is precisely the same. In other words, there can be no question regarding the amount to be paid Taylor or the services he was to render to earn it. Probably no one will dispute the proposition that if the money had been paid by the Ontario & Western Company and if the deed had been taken by it within the time named, Taylor would be entitled to the $10,000 even if he had done nothing more. He had named the purchaser who took the deed and, under the contract, was entitled to the compensation therein stipulated. How then is the liability altered if it appears that the actual purchaser, who furnished the money and obtained full control of the property, for reasons of its own placed the legal title in a corporation absolutely owned and controlled by it?

Without intending to intimate that the defendant has been guilty of disingenuous conduct, we think it cannot be denied that a ruling exculpating him because the deed was not actually taken by the Ontario & Western Company would open wide the door to chicanery and fraud.

It remains to consider whether, prior to February 19, 1906, the defendant's coal lands were sold, leased or came under the control of a purchaser named by the plaintiff. On December 28, 1905, the property was deeded by Rickard to the Scranton Coal Company. If this company was named by Taylor it follows that, under the strict, literal meaning of the contract, it was sold to one of his "probable purchasers."

But, in order to avoid the complications regarding the disputed question of fact before adverted to, we think there can be no answer to the proposition that by the deed to the coal company the property came

under the control of the Ontario & Western Company—concededly named by plaintiff. The money which was paid to the defendant on November 16th upon the contract and the $225,000 paid him on December 11th was ostensibly furnished by the Scranton Coal Company.

All the capital stock of the Scranton Coal Company amounting to $200,000 was owned and held by the Ontario & Western Company except a few qualifying shares, as before stated. A majority of the coal company's directors were directors of the railway company. James E. Burr, through whom the property was purchased was the attorney for both companies. James E. Rickard in whose name the first deed was taken was secretary and treasurer of both companies. It is unnecessary to pursue the subject as we have no doubt that the Ontario & Western Company furnished the money which purchased the land in question, acquired full control and is the de facto owner of the same.

It is contended by the plaintiff that the defendant knew, or should have known, that the parties who dealt with him and procured the transfers of the property were in fact the agents of the Ontario & Western Company. It is also argued by the plaintiff that the transfer of the title by the circuitous method shown was but a subterfuge to enable the defendant to avoid his contract obligations. We do not consider it necessary to decide these questions.

The judgment is affirmed with costs.